UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SARAH LEBRON, o/b/o M.L.,                          :

               Plaintiff,                 :         13cv09140 (WHP) (DF)

   -against-                                       :         **REPORT AND
                                                                    RECOMMENDATION**

                                                         :

CAROLYN W. COLVIN, Acting
Commissioner of Social Security Administration,    :


                                                         :

             Defendant.
------------------------------------------------------------X

**TO THE HONORABLE WILLIAM H. PAULEY, III, U.S.D.J.:**

      In this action, plaintiff Sarah Lebron ("Plaintiff"), on behalf of her minor child, referred

to herein as "M.L.," seeks review of the final decision of Administrative Law Judge ("ALJ")

Zachary S. Weiss in favor of defendant Carolyn W. Colvin, Acting Commissioner of the Social

Security Administration ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental

Security Income ("SSI") disabled child benefits for M.L. under the Social Security Act (the

"Act") on the ground that M.L.'s impairments did not constitute a disability for the purposes of

the Act.  Plaintiff has now moved, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings reversing the ALJ's decision, or, in the alternative,

remanding the case for further proceedings (Dkt. 11), and Defendant has cross-moved for

judgment on the pleadings affirming the decision of the ALJ (Dkt. 13).

      For the reasons set forth below, I recommend that the case be remanded for further

proceedings, pursuant to sentence four of 42 U.S.C. § 405(g), and that, upon remand, the case be

assigned to a different ALJ.

# BACKGROUND[1]

On May 10, 2010, Plaintiff filed an application for SSI on behalf of M.L.  (R. at 168-71.)
The basis for Plaintiff's application was M.L.'s alleged disability due to bipolar disorder and
attention deficit hyperactivity disorder ("ADHD"), purportedly commencing on April 9, 2010,
when M.L. was five years old.  (*Id.*)  At the time the application was made, M.L. was still five
years old (*see id.* at 168), and, at the time of the ALJ's decision, M.L. was six years old (*see id.*
at 37).

### A.    Medical Evidence

The documentary evidence in the Record is composed mainly of the medical evaluations
and treatment notes of M.L.'s treating psychiatrist, Dr. Aurora Tompar-Tiu, but also includes the
medical opinions of two consultative physicians (one based on a review of records and one based
on an examination).  In addition, at the hearing, the ALJ took testimony from a psychological
expert and from Plaintiff.  As indicated throughout this section, much of the medical evidence in
the Record was submitted after the date of the hearing before the ALJ, but before the ALJ issued
his decision.

### 1.    April 8, 2010 Examination by Dr. Tiu

On April 8, 2010, Plaintiff brought M.L. to Dr. Tiu, a child psychiatrist, for a psychiatric
examination.  (*Id.* at 250.)  Plaintiff reported that, at that time, M.L. suffered from an "anger and
aggression problem."  (*Id.*)  Dr. Tiu's notes indicate that M.L. was experiencing several
symptoms, including a decrease in appetite, weight loss, diurnal mood changes, impaired
concentration, irritability, expansive and/or elevated mood, inability to control her temper,

---

[1] The background facts set forth herein are taken from the administrative record (referred
to herein as "R."), which includes, *inter alia,* M.L.'s medical records and the transcript of the
hearing held before the ALJ.

impulsivity, aggressivity, attention deficiency, learning problems, enuresis,[2] and hyperactivity. (*Id.*)  Dr. Tiu's notes further indicate that M.L. experienced nightmares in which "someone killed [M.L.] and [Plaintiff]," and that M.L. expressed a fear of being alone.  (*Id.*)  According to Dr. Tiu's notes, M.L. was cooperative and coherent during the examination, but her affect was labile,[3] she was angry and irritable, and was unable to comprehend spoken words.  (*Id.* at 252-53.)  Dr. Tiu also indicated that M.L. was hyperactive and fidgeted.  (*Id.* at 253.)  Dr. Tiu diagnosed M.L. with bipolar disorder and post-traumatic stress disorder ("PTSD").  (*Id.* at 254.) She further found that M.L. had a Global Assessment of Function ("GAF") score of 45.[4]  Her notes indicate that M.L. was not experiencing any other medical problems at the time.  (*Id.* at 252.)

### 2.      April 29, 2010 Follow-Up with Dr. Tiu[5]

On April 29, 2010, M.L. had a follow-up appointment with Dr. Tiu.  (*Id.* at 329.) Dr. Tiu's notes indicate that M.L. was demonstrating greater aggression toward her brother and Plaintiff, was exhibiting more frequent mood swings, and continued to experience insomnia and nightmares.  (*Id.*)  Dr. Tiu prescribed Abilify for M.L.  (*Id.*)

---

[2] Enuresis refers to "the involuntary discharge of urine."  *See* http://www.merriam-webster.com/dictionary/enuresis (last visited Dec. 16, 2014).

[3] Labile means "characterized by wide fluctuations" or "emotionally unstable."  *See* http://www.merriam-webster.com/dictionary/labile (last visited Dec. 16, 2014).

[4] The GAF scale, a scale from 0 to 100, may be used to report the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. rev. 2000) ("*DSM-IV*").  A GAF of 41 to 50 represents "serious symptoms" or "serious impairment" in social, occupational or school functioning.  *Id.* at 34.

[5] As discussed in greater detail in the Procedural History and Section III, *infra*, the treatment notes from this visit were submitted after the hearing before the ALJ but before the ALJ issued his decision.

### 3.      June 10, 2010 Follow-Up with Dr. Tiu[6]

During a follow-up appointment on June 10, 2010, Dr. Tiu noted that M.L. was exhibiting fewer mood swings and decreased aggression toward Plaintiff, but was still demonstrating intermittent irritability and aggression toward her brother.  (*Id.* at 328.)  Dr. Tiu prescribed an increased dosage of Abilify, as well as ongoing therapy.  (*Id.*)

### 4.      June 18, 2010 Report to Social Security Administration by Dr. Tiu

On June 18, 2010, Dr. Tiu submitted a medical evaluation to the New York State Office of Temporary and Disability Assistance in support of M.L.'s application for SSI benefits.  (*Id.* at 237-44.)  Dr. Tiu identified M.L.'s treating diagnoses as PTSD, bipolar disorder, learning disorder, and expressive language disorder, and identified M.L.'s symptoms as bad dreams, hypervigilance, anxiety, fear of being alone, aggression, mood swings (including periods of dysphoria and irritable mood alternating with elevated mood), intermittent insomnia, impulsivity, decreased concentration and motivation, learning difficulties, and difficulties expressing herself. (*Id.* at 238.)  Dr. Tiu noted that M.L. was reported to have witnessed her father physically and verbally abuse Plaintiff, prior to Plaintiff's separation from M.L.'s father.  (*Id.* at 240.)

Dr. Tiu reported that M.L., who was then five years old, possessed the cognitive skills of a four-year-old due to "some learning difficulties," and the social and emotional skills of a three-year-old because of "problems relating with peers, siblings, and authority figures," and because she "easily [became] provoked and aggressive."  (*Id.* at 241.)  Dr. Tiu indicated that M.L.'s attitude and behavior were cooperative, but that M.L. was hesitant to answer some questions and was unable to express herself fully.  (*Id.* at 242.)  She further indicated that M.L. required close

---

[6] The treatment notes from this visit were submitted after the hearing before the ALJ. (*See supra* n.5, and Procedural History and Section III, *infra*.)

4

supervision to groom herself and to maintain good hygiene, and that M.L. had limited interests and no hobbies.  (*Id.* at 243.)

Dr. Tiu described M.L.'s speech as coherent, goal directed, and displaying concrete thinking, but exhibiting limited vocabulary.  (*Id.* at 242.)   In addition, Dr. Tiu described M.L.'s mood as irritable and anxious, with intermittent mood swings, and indicated that M.L. displayed decreased attention and concentration, and was unable to perform calculations or serial threes. (*Id.*)  She indicated that M.L. had limited insight with poor and juvenile judgment, but noted that, at that time, M.L. did not display looseness of association,[7] or appear to experience hallucinations or delusions.  (*Id.*)  Dr. Tiu further indicated that M.L.'s fine and gross motor skills and sensory abilities were age appropriate, but that her communication skills were at a four-year-old level due to M.L.'s "difficulties expressing herself."  (*Id.* at 239.)

Dr. Tiu also described the treatment she had prescribed for M.L., including taking Abilify and undergoing individual supportive therapy, as well as parenting sessions with Plaintiff.  (*Id.*) Dr. Tiu stated that the duration of M.L.'s condition would vary according to her response to treatment.  (*Id.*)  She indicated, however, that M.L. had already begun responding to treatment with decreased aggression, improved sleep (including fewer nightmares and bad dreams), and decreased mood swings.  (*Id.* at 243.)  She also indicated that M.L.'s GAF at that time was 50.[8] (*Id.* at 240.)

---

[7] Looseness of association refers to "a disturbance of thinking in which the association of ideas and thought patterns becomes so vague, fragmented, diffuse, and unfocused as to lack any logical sequences or relationship to any preceding concepts or themes."  *See* http://medical-dictionary.thefreedictionary.com/looseness+of+association (last visited Dec. 16, 2014).

[8] *See* n.4, *supra.*

5

### 5.   June 21, 2010 Evaluation by Dr. M. Malik

On June 21, 2010, consulting examiner Dr. M. Malik provided a medical opinion with regard to M.L.'s impairments, based on a review of her medical records.  (*Id.* at 229-35.)  Dr. Malik's evaluation listed bipolar disorder as M.L.'s only impairment, and concluded that, while M.L. was severely impaired, her impairments did not meet or equal the criteria of a disabling impairment listed in the regulations, as required for SSI eligibility.[9]  (*Id.* at 230.)  Specifically, in Dr. Malik's opinion, M.L. demonstrated less than marked limitations in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  (*Id.* at 232.)  With respect to interacting and relating with others, Dr. Malik noted that M.L. was being treated with Abilify, which had improved her symptoms.  (*Id.*)  Dr. Malik also stated that, in his medical opinion, M.L. had no limitation in the functional domains of moving about and manipulating objects, caring for herself, and health and physical well-being.  (*Id.* at 233.)

### 6.   August 7, 2010 Follow-Up with Dr. Tiu[10]

On August 7, 2010, M.L. visited Dr. Tiu for a follow-up appointment.  According to Dr. Tiu's notes, M.L. showed decreased aggression, and Plaintiff indicated that M.L. had "stopped hitting [her]."  (*Id.* at 327.)  M.L., however, had continued to experience insomnia and to exhibit learning difficulties, and her appetite had decreased.  (*Id.*)  Dr. Tiu prescribed Seroquel to treat M.L.'s insomnia, in addition to the Abilify.  (*Id.*)

---

[9] These criteria are discussed in greater detail in Section I(B), *infra*.

[10] The treatment notes from this visit were submitted after the hearing before the ALJ. (*See supra* n.5, and Procedural History and Section III, *infra*.)

The same day, Dr. Tiu provided a note, in which she wrote that M.L. was being treated for bipolar disorder, PTSD, learning disorder, and expressive language disorder, and that her medication "[had] been adjusted due to her insomnia, decreased appetite, increased anxiety, and depressive symptoms." (*Id.* at 236.)  Dr. Tiu further noted that M.L. exhibited "limitations" in her learning, social, and emotional skills, "with delays in expressing her emotions and ability to relate with her peers as well as limitation in expressive language." (*Id.*)

### 7.      October 7, 2010 Follow-Up with Dr. Tiu[11]

On October 7, 2010, M.L. had another follow-up appointment with Dr. Tiu.  (*Id.* at 326.) According to Dr. Tiu's notes, Plaintiff reported that there had been "some improvement" in M.L.'s symptoms, including a decrease in her aggression.  She also reported that M.L. still had difficulty expressing herself, as well as poor social skills.  (*Id.*)  Dr. Tiu continued to prescribe Abilify and Seroquel for M.L.  (*Id.*)

### 8.      November 13, 2010 Follow-Up with Dr. Tiu[12]

M.L. visited Dr. Tiu again on November 13, 2010.  (*Id.* at 325.)  According to Dr. Tiu's notes, M.L. was experiencing hypervigilance, nightmares and bad dreams, mood swings, and irritability, and exhibited poor social, learning, and communication skills.  (*Id.*)  Dr. Tiu continued M.L.'s prescriptions for medication and therapy.  (*Id.*)

### 9.      June 1, 2011 Follow-Up with Dr. Tiu

M.L. saw Dr. Tiu again on June 1, 2011 (*id.* at 337), after having missed appointments on December 4, 2010, February 19, 2011, and May 26, 2011 due to Plaintiff's illness (*id.* at 338).

---

[11] The treatment notes from this visit were submitted after the hearing before the ALJ. (*See supra* n.5, and Procedural History and Section III, *infra*.)

[12] The treatment notes from this visit were submitted after the hearing before the ALJ. (*See supra* n.5, and Procedural History and Section III, *infra*.)

According to Dr. Tiu's notes, Plaintiff reported that M.L. had had a "very good response" to the prescribed medications.  (*Id.* at 337.)  Dr. Tiu noted that M.L. exhibited decreased aggression and self-destructive behavior, as well as fewer mood swings, but that she still had intermittent mood swings, displayed learning and communication skills difficulties, and had poor social skills.  (*Id.*)  Dr. Tiu further noted that M.L. experienced decreased concentration, and was sleeping less.  (*Id.*)

Dr. Tiu also prepared a summary of M.L.'s prior follow-up visits.  In this summary, she wrote that, with the combination of Seroquel and Abilify, M.L. was experiencing decreased agitation, aggression, irritability, and self-destructive behavior; fewer mood swings; improved sleep; and improved behavior at home and in public.  (*Id.* at 256.)  Dr. Tiu indicated that M.L. was to continue with medication and therapy.  (*Id.*)

### 10.    June 1, 2011 Child Bipolar Questionnaire Completed by Dr. Tiu

On the same day, Dr. Tiu also completed a Child Bipolar Questionnaire (the "Questionnaire"), which solicited her medical opinion as to whether M.L. exhibited the symptoms and impairments of Mood Disorder, as defined in in the regulations.  (*Id.* at 245-49.)  In the Questionnaire, Dr. Tiu indicated, by checking "[y]es" under each symptom, that M.L. suffered from all of the listed symptoms of disturbance of mood, including, *inter alia*, "[d]epressed or irritable mood," "appetite or weight increase or decrease," "difficulty thinking or concentrating," "[s]leep disturbance," "[e]asy distractibility," "[s]uicidal thoughts or acts" (next to which Dr. Tiu wrote that M.L. exhibited certain self-destructive behaviors), "[h]allucinations, delusions, or paranoid thinking" (next to which Dr. Tiu wrote that M.L. experienced intermittent visual hallucinations), and "[i]ncreased talkativeness or pressure of speech."  (*Id.* at 245-47.)

Dr. Tiu further indicated, again by checking "[y]es," that M.L. suffered from "[b]ipolar or cyclothymic syndrome[13] with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes" (*id.* at 247), and that M.L. had "marked" impairments in all of the domains listed in the Questionnaire:  cognitive/communicative functioning, social functioning, personal functioning, and maintaining concentration, persistence, or pace (*id.* at 248).

### 11.   June 30, 2011 Well-Child Examination by Dr. Archana Singiri[14]

On June 30, 2011, M.L. visited Dr. Archana Singiri for a "well child" examination.  (*Id.* at 336.)  Dr. Singiri's notes indicate that M.L. reported a medical history of bipolar disorder, PTSD, and a learning disorder.  (*Id.*)  Regarding language, Dr. Singiri indicated that M.L. knew her colors, could print her first name, and asked questions.  (*Id.*)  In terms of social development, Dr. Singiri indicated that M.L. followed rules, helped in chores, and played cooperatively.  (*Id.*) With respect to gross motor development, M.L. was reportedly able to skip and jump over small obstacles.  (*Id.*)  Finally, regarding cognitive and fine motor development, Dr. Singiri reported that M.L. could copy a triangle, dress herself, and catch a ball.  (*Id.*)

### 12.   July 16, 2011 Follow-Up with Dr. Tiu[15]

M.L. visited Dr. Tiu for a follow-up on July 16, 2011.  Dr. Tiu's notes again indicate that Plaintiff reported that M.L. had stopped hitting Plaintiff since starting medication.  (*Id.* at 323.)

---

[13] Cyclothymic syndrome is a "mood disorder characterized by alternating episodes of depression and elation in a form less severe than bipolar disorder."  *See* http://www.merriam-webster.com/dictionary/cyclothymia (last visited Dec. 16, 2014).

[14] The treatment notes from this visit were submitted after the hearing before the ALJ. (*See supra* n.5, and Procedural History and Section III, *infra*.)

[15] This visit, and all subsequent medical treatment and evaluation, took place after the date of the hearing before the ALJ.

M.L. still exhibited several other symptoms, however, including distractibility, irritability

(including crying episodes), impulsivity, mood swings, dysphoric mood, poor concentration,

inattention, intermittent aggression toward her brother and peers, poor social skills, and sleep

disturbances. (*Id.*)  Dr. Tiu indicated that M.L. should continue taking Abilify, prescribed an

increase in Seroquel, and prescribed Adderall for M.L.'s concentration issues. (*Id.*)  She also

referred M.L. for further evaluation of her learning problems. (*Id.*)

### 13.      July 20, 2011 Letter from Dr. Tiu

On July 20, 2011, Dr. Tiu supplied a letter summarizing her findings during her

examination and treatment of M.L. as well as her prescription for further treatment. (*Id.* at 324.)

Dr. Tiu wrote that, since M.L.'s initial evaluation on April 8, 2010, M.L. had displayed a "fair

response" to her medications, with respect to her aggression and irritability. (*Id.*)  With respect

to M.L.'s other symptoms, however – including dysphoric mood, mood swings, insomnia, poor

concentration, and severe difficulties in relating to others – Dr. Tiu noted that these persisted in

spite of M.L.'s medication. (*Id.*)  Dr. Tiu also stated that M.L. should continue her medication

and therapy. (*Id.*)

### 14.      August 11, 2011 Follow-Up with Dr. Tiu

On August 11, 2011, M.L. had another follow-up appointment with Dr. Tiu. (*Id.* at 322.)

Dr. Tiu's notes indicate M.L. was experiencing intermittent difficulty falling asleep, aggression

toward her brother, and grandiose thoughts, and that she was demanding and irritable at times.

(*Id.*)  According to Dr. Tiu's notes, Plaintiff reported that M.L. responded better to Abilify and

Seroquel, and experienced adverse side effects with Adderall. (*Id.*)  Dr. Tiu increased M.L.'s

Seroquel dosage to stabilize her mood, and indicated that M.L. should continue taking Abilify.[16]
(*Id.*)

### 15.   October 11, 2011 Child Intelligence
### Evaluation by Dr. Edward Hoffman

On October 11, 2011, psychologist Dr. Edward Hoffman performed a consultative child

intelligence evaluation of M.L.  (*Id.* at 343-45.)  By way of background, Dr. Hoffman noted that

M.L. had repeated kindergarten due to academic difficulty and that she was being evaluated for

special education.  (*Id.* at 343.)  He further noted that M.L.'s father "was hospitalized

psychiatrically."  (*Id.*)  Dr. Hoffman ultimately recommended that M.L. continue to receive

outpatient mental health treatment and receive special education services.  (*Id.* at 345.)

In his evaluation, Dr. Hoffman provided behavioral observations, in which he described

M.L. as cooperative, having a pleasant demeanor, and maintaining good eye contact, but in

which he also noted that her attention and concentration were below average and that she was not

able to follow directions well.  (*Id.* at 343.)  Dr. Hoffman also administered the Weschler

Preschool and Primary Scale of Intelligence test, a standardized intelligence measure, to M.L.

(*Id.* at 344.)  He indicated that M.L. displayed average ability in coding and symbol search, and

low-average ability in picture concepts and vocabulary.  M.L. further displayed borderline

functioning in word reasoning, matrix reasoning, information, and block design.  (*Id.*)

Dr. Hoffman reported that "[M.L.] cannot follow age-appropriate directions.  She can

perform some age-appropriate cognitive tasks.  She can relate adequately to others.  She can

learn in accordance with cognitive functioning.  The allegations of cognitive impairment are

supported by testing today.  She also has a history of academic failure."  (*Id.* at 344-45.)

---

[16] The last line of this document, presumably regarding Dr. Tiu's instructions regarding
M.L's medications and future follow-up visits, is not legible.

11

Dr. Hoffman indicated that M.L.'s prognosis was "fair," and that "[i]t [was] hoped that with continued intervention and support, she [would] find symptom relief and maximize her abilities." (*Id.* at 345.)

### B.   Procedural History

#### 1.   Plaintiff's SSI Application on Behalf of M.L.

Plaintiff initially filed an application for SSI benefits, on M.L.'s behalf, on May 10, 2010 (*id.* at 168-71), just over a month after Dr. Tiu's initial examination of M.L.  In the application, Plaintiff claimed that that the onset date of M.L.'s disability was April 9, 2010.  (*Id.* at 168.)  The application was denied on June 22, 2010, based on a finding that M.L. was not disabled within the meaning of the Act.  (*Id.* at 82-86).  On August 9, 2010, Plaintiff, acting *pro se*, timely requested an administrative hearing (*id.* at 87), and a hearing was scheduled for November 9, 2010 (*id.* at 97).  After retaining current counsel on November 8, 2010 (*id.* at 116, 126), the hearing was adjourned to June 3, 2011, before ALJ Zachary S. Weiss (*id.* at 134).

#### 2.   The Administrative Hearing and Decision Denying Benefits

On June 3, 2011, Plaintiff and M.L. appeared at the hearing before the ALJ, represented by counsel.  (*See id.* at 42-81.)  Testimony was taken from psychological expert Dr. Robert M. Berk (*id.* at 48-61), and from Plaintiff (*id.* at 66-79).  M.L. was also questioned briefly by the ALJ, at Dr. Berk's request.  (*Id.* at 61-62.)  At the time of the hearing, as noted above, Plaintiff had not yet obtained all of Dr. Tiu's past treatment notes (*id.* at 45), and the Record now also contains considerable medical evidence relating to M.L.'s condition after the date of the hearing.

At the hearing, Dr. Berk testified that, in his medical opinion, based on his review of medical records in M.L.'s file at the time, M.L.'s medical impairments did not meet or equal any impairment listed in the regulations.  (*Id.* at 49.)  He specifically testified that "[it was] hard for

[him] to accept the presentation that [M.L.] has every one of the things [that were] listed" in Questionnaire, which was completed by Dr. Tiu two days before the hearing.  (*Id.* at 50.) Dr. Berk testified that, based on his experience, it would be "extremely unusual" for one patient to demonstrate every symptom of bipolar disorder, and that, with respect to several symptoms, there was "nothing [in the medical records] to demonstrate that [the Questionnaire was] correct, or that [it was] accurate or reliable."  (*Id.*)  He further testified that, without additional treatment records, he was "at a loss as to how to evaluate the information [contained in the Questionnaire]."  (*Id.* at 54.)

Dr. Berk also testified that, in his medical opinion, based on his review of medical records that were available to him at the time, M.L. had a less than marked impairment in acquiring and using information, a less than marked impairment in attending and completing tasks, a less than marked impairment in interacting with others, no impairment in moving about and manipulating objects, no impairment in caring for herself, and a less than marked impairment in health and physical wellbeing.  (*Id.* at 51.)  Dr. Berk based his conclusion, in large part, on Dr. Tiu's notes indicating that M.L. had responded well to her medication.  (*Id.* at 49, 58.)

After Dr. Berk testified, Plaintiff testified as to M.L.'s symptoms and impairments, both with and without medication.  (*Id.* at 66-79.)  Plaintiff testified that the medication had decreased M.L.'s aggression generally (*id.* at 69), but that M.L. would still demonstrate aggression toward her brother (*id.* at 73, 75) and toward peers (*id.* at 74, 79).  She further testified that, even while taking her prescribed medication, M.L. experienced hallucinations (*id.* at 76), exhibited self-destructive behaviors (*id.* at 77), and had difficulty communicating (*id.* at 78).

On December 9, 2011, after receiving additional medical records from Plaintiff (*id.* at 257-338), the ALJ denied Plaintiff's application for SSI benefits on M.L.'s behalf (*id.* at 23-37), in a decision that is discussed in detail in Section II, *infra*.  By letter dated December 16, 2011, Plaintiff requested that the Appeals Council review the ALJ's decision.  (*Id.* at 17-19.)  On January 14, 2013, the Appeals Council denied Plaintiff's request for review (*id.* at 6-9), making the ALJ's decision the final decision of the Commissioner.

### 3.    <u>The Current Action and the Motions Before This Court</u>

On December 27, 2013, Plaintiff, on behalf of M.L., filed a Complaint before this Court, alleging that the ALJ's decision, as affirmed by the Appeals Council, was "not supported by substantial evidence on the [R]ecord" and was "contrary to the law."  (Civil Complaint, dated Dec. 12, 2013 ("Complaint") (Dkt. 2), at ¶¶ 10-11.)  Defendant answered the Complaint on March 10, 2014.  (*See* Dkt. 7.)

Plaintiff moved for judgment on the pleadings on May 16, 2014.  (*See* Notice of Motion, dated Apr. 15, 2014 (Dkt. 11); Plaintiff's Memorandum of Law, dated Apr. 15, 2014 ("Pl. Mem.") (Dkt. 12).)  On June 12, 2014, Defendant opposed Plaintiff's motion and cross-moved for judgment on the pleadings.  (*See* Notice of Motion, dated June 12, 2014 (Dkt. 13); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated June 12, 2014 ("Def. Mem.") (Dkt. 14).)  On July 1, 2014, Plaintiff filed a reply and opposition to Defendant's cross-motion.  (*See* Reply, dated July 1, 2014 (Dkt. 15).)

In support of her claim for benefits, Plaintiff argues that:  (1) "the ALJ erred in failing to find a listing level impairment and failed to follow the treating physician rule" (*see* Pl. Mem., at 13-18); (2) "the ALJ erred in evaluating the 'domain' areas of the listing" (*see id.*, at 18-21); and

(3) "the ALJ displayed bias" (*see id.*, at 21-23).  Defendant argues, in her opposition and cross-motion, that the final decision of the Commissioner should be upheld because the ALJ's decision was supported by substantial evidence.  (*See* Def. Mem, 13-25.)

Plaintiff's motion and Defendant's cross-motion for judgment on the pleadings are currently pending before this Court.

## DISCUSSION

## I.  APPLICABLE LEGAL STANDARDS

### A.  Standard of Review

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of the Commissioner's decision is limited.  The Commissioner's decision is final provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Carter*, 221 F.3d 126, 131 (2d Cir. 2000).  "Where an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).  Thus, a court must first ensure that the ALJ applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

A court must then determine whether the Commissioner's decision is supported by substantial evidence. *See Tejada*, 167 F.3d at 773. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). A court must consider the record as a whole in making this determination, but it is not for the reviewing court to decide *de novo* whether the plaintiff is disabled. *See Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). Thus, a court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (affirming ALJ decision where substantial evidence supported both sides).

### B.     Standard for Determining Disability in a Child

A child is disabled under the Act if he or she:

[1] has a medically determinable physical or mental impairment,
[2] which results in marked and severe functional limitations, and
[3] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . [; however,] no individual under the age of 18 who engages in substantial gainful activity . . . may be considered to be disabled.

42 U.S.C. § 1382c(a)(3)(C)(i)-(ii); *see* 20 C.F.R. § 416.906; *see also Encarnacion ex rel. v. Astrue*, 568 F.3d 72, 75 (2d Cir. 2009). The Commissioner's regulations set forth a three-step sequential evaluation process to determine whether an individual under age 18 is disabled within the meaning of the Act. 20 C.F.R. § 416.924(a). In the first step, the ALJ must determine

16

whether the claimant is engaged in substantial gainful activity. *Id.* §§ 416.924(a), (b). If so, the

child is not under a disability. *Id.* If not, the analysis proceeds to step two, where the ALJ must

determine whether the child has a severe medically determinable impairment. *Id.*

§§ 416.924(a), (c). If the child's impairment constitutes only "a slight abnormality or a

combination of slight abnormalities that causes no more than minimal functional limitations," the

child will not be found to be disabled. *Id.* § 416.924(c).

If the claimant satisfies step two, the analysis proceeds to the final step, which requires

the ALJ to determine whether the claimant's impairment(s) meets, medically equals, or

functionally equals the criteria of an impairment found in 20 C.F.R. Pt. 404, Subpt. P, App. 1

(the "Listings"). *Id.* §§ 416.924(a), (d). An impairment "functionally equal[s]" the Listings if it

results in either a "'marked' limitation" in two of six defined domains of functioning, or an

"'extreme' limitation" in one domain of functioning. *Id.* § 416.926a(a). The six domains of

functioning are: (i) acquiring and using information; (ii) attending and completing tasks; (iii)

interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for

oneself; and, (vi) overall health and physical well-being. *Id.* §§ 416.926a(b)(1)(i)-(vi). When

making a finding with regard to functional equivalence, an ALJ must "assess the interactive and

cumulative effects of all of the impairments for which [there is] evidence, including any

impairments" that are not "severe." *Id.* § 416.926a(a).

Under the regulations, a "marked limitation" is defined as one that is "'more than

moderate,' but 'less than extreme,' and 'seriously' interferes with a claimant's ability to

independently initiate, sustain, or complete activities." *Marizan ex rel. A.O. v. Colvin*,

No. 13cv3428 (VEC) (FM), 2014 WL 3905911, at *8 (S.D.N.Y. Aug. 11, 2014) (quoting

20 C.F.R. § 416.926a(e)(2)). An "extreme limitation" is defined as one that "'very seriously'

interfere[s] with a claimant's ability to initiate, sustain, or complete activities independently," and although it is "not necessarily indicative of a total loss of functioning, an 'extreme' rating is given to only the 'worst limitations.'" *Id.* (quoting 20 C.F.R. § 416.926a(e)(3)).

### C.     Weight To Be Accorded to the Opinions of Treating Physicians

Under the "treating physician rule," The ALJ must give "controlling weight" to a treating physician's opinion as to the nature and severity of a claimant's impairments, as long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Id.* § 416.927(c)(2).  Where the ALJ decides to give less than controlling weight to a treating physician's opinion, and also in determining the weight to be accorded to the opinion of a non-treating physician, "the ALJ must apply a series of factors in determining the weight to give such an opinion." *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)[17]).  These factors include:  (1) the length, nature, and extent of the relationship between the claimant and the physician; (2) the supportability of the physician's opinion; (3) the consistency of the physician's opinion with the record as a whole; and (4) the specialization of the physician providing the opinion.  20 C.F.R. § 416.927(c)(2)-(5); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that these factors "must be considered when the treating physician's opinion is not given controlling weight").  Where the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must give "good reasons" for granting it lesser weight.  *Id.* § 416.927(c)(2).

---

[17] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527, 416.927, by, among other things, removing paragraph (c), and redesignating paragraphs (d) through (f) as (c) through (e).

## II.   THE ALJ'S DECISION

In his December 9, 2011 decision, the ALJ found that M.L. was not disabled under the Act and thus denied Plaintiff's request, on M.L.'s behalf, for SSI benefits.  (R. at 37.)

### A.   The ALJ's Use of the Relevant Three-Step Sequential Evaluation

As an initial matter, the ALJ determined that M.L. was a "preschooler" on the date the application was filed, and was a "school-age child" at the time of the decision.  (*Id.* at 26.)  In evaluating M.L.'s eligibility for SSI benefits, the ALJ applied the three-step sequential evaluation process mandated by the Commissioner's regulations for determining whether a child is disabled under the Act.  (*See id.* at 26-27.)

At step one of the analysis, the ALJ concluded that M.L. had not engaged in substantial gainful activity since the date of Plaintiff's application.[18]  (*Id.* at 26.)  At step two, the ALJ found that M.L. had the following severe impairments:  bipolar disorder and ADHD.  He concluded that these impairments imposed "more than minimal limitations" on M.L.'s capacity "to function effectively on a daily basis, relative to other children her age who do not have impairments." (*Id.*)

At the third step, the ALJ found that M.L.'s impairments did not meet or medically equal the criteria set forth in the Listings, and he thus went on to determine whether M.L.'s impairments were functionally equivalent to a listed impairment.  (*Id*. at 27.)  The ALJ considered, in turn, each of the six relevant domains of functioning (*id*. at 29-36), and ultimately concluded that M.L.'s impairments were not functionally equivalent to a listed impairment (*id.* at 37).

---

[18] Although the ALJ states that the application was filed on April 12, 2010 (R. at 26), the Record demonstrates, as noted above, that Plaintiff filed the initial application on May 10, 2010 (*id.* at 168-71).

**B.     The ALJ's Consideration of Whether M.L.'s**
**        Impairments Medically Equaled the Listings**

As stated above, the ALJ found that M.L. did not have an impairment or combination of

impairments that medically equaled the Listings.  (*Id.* at 26.)  He based this conclusion primarily

on Dr. Berk's expert testimony that it was "difficult for [Dr. Berk] to accept" that M.L. exhibited

all of the symptoms indicated by Dr. Tiu in the Questionnaire, based on his experience that "it is

extremely rare" for any patient to exhibit, at once, all of the symptoms indicated in the

Questionnaire, and his opinion that the evidence in the Record did not support Dr. Tiu's findings

that M.L's impairments were "marked," as required to meet the Listing.  (*Id.*)  The ALJ also

stated, without reference to any specific evidence, that "the medical evidence reflect[ed] domain-

related functioning that [was] improving (with medication) rather than functioning that [was]

regressing to a 'marked' degree," and indicated that this conclusion would be supported later in

his opinion.  (*Id.*)  The ALJ went on to state that, for these reasons, he "accept[ed], and [gave]

the greatest weight" to Dr. Berk's testimony that M.L.'s impairments did not meet or medically

equal the Listings.  (*Id.*)  The ALJ did not state, at this step in the inquiry, what weight he

accorded to any other evidence in the Record.

**C.     The ALJ's Consideration of Whether M.L.'s**
**        Impairments Functionally Equaled the Listings**

As also indicated above, the ALJ further found that M.L.'s impairments did not

functionally equal the Listings.  At this step in the inquiry, the ALJ stated that he "considered all

of the relevant evidence in the case record," including:

> objective medical evidence and other relevant evidence from
> medical sources; information from other sources such as school
> teachers, family members, or friends; the claimant's statements
> (including statements from the claimants parent(s) or other
> caregivers); and any other relevant evidence in the case record,
> including how the claimant functions over time and in all settings

20

(*i.e.*, at home, at school, and in the community).

(*Id*. at 27.)

The ALJ correctly asserted that he was required to follow a two-step process in considering M.L.'s symptoms – first, determining whether there was an underlying physical or mental impairment that could have reasonably been expected to produce the alleged symptoms, and, second, evaluating the extent to which the "intensity, persistence or functionally limiting effects of . . . [those] symptoms" limited M.L.'s functioning.  (*Id*.)  In this regard, the ALJ stated that he had found, based on the evidence in the Record, that M.L. had medically determinable impairments that could have reasonably been expected to produce the alleged symptoms, although the ALJ did not state what those impairments were, nor did he refer to the evidence he considered in making this determination.  (*Id*. at 27-28.)  Nonetheless, the ALJ found that, for reasons purportedly explained in his decision, the statements in the Record concerning "the intensity, persistence and limiting effects of [M.L.'s] symptoms" were "not credible," to the extent they were inconsistent with the ALJ's finding that M.L.'s impairments did not functionally equal the Listings.  (*Id*. at 28.)

## 1.    Weight the ALJ Accorded to the Evidence in Considering Functional Equivalence

At this step in the inquiry, the ALJ again stated that he gave the "greatest weight" to the testimony of Dr. Berk, this time giving the following reasons:  (1) Dr. Berk's "opportunity to observe [M.L.] at the hearing," (2) his "extensive experience and familiarity in the field of Child Psychiatry," and (3) the ALJ's finding that Dr. Berk's testimony was "consistent with the substantial evidence."  (*Id*.)

In addition, the ALJ stated that he gave "highly significant weight" to the consultative report of Dr. Hoffman, based on the ALJ's conclusion that Dr. Hoffman, "[a]fter conducting a

thorough evaluation of [M.L.] . . . reached conclusions consistent with the substantial evidence." (*Id.*)

The ALJ stated that he also accorded "highly significant weight" to "those treating source opinions that [were] consistent with the substantial evidence," but "less than significant weight" to the treating source opinions "that [were] not consistent with the substantial evidence," a somewhat cryptic assertion, given that Dr. Tiu was the only treating physician who provided a medical opinion with respect to M.L.'s symptoms and impairments.  (*Id.*)[19]  The ALJ did not discuss Dr. Tiu's medical findings, diagnoses, or opinions, other than to reference her Questionnaire, and one treatment note; he accorded "less than significant weight" to the Questionnaire, purportedly because it was inconsistent with the substantial evidence (*see id.*), and, in support of this conclusion, he referenced one note by Dr. Tiu that had indicated that M.L. was showing a "better response" to medication (*id.*).

Finally, the ALJ gave "good weight" to Dr. Malik's evaluation form because, though Dr. Malik never met M.L., he purportedly "expressed . . . assessments that [were] consistent with the substantial evidence."  (*Id.*)[20]

---

[19] In fact, the AJL's comment in this regard appears to be little more than boilerplate, all the more evidently because, in the same paragraph, the ALJ referenced "treating sources," in the plural (*see id.* ("Said treating sources have developed longstanding clinical relationships with the claimant and have had an opportunity to develop a comprehensive, longitudinal perspective regarding the claimant's impairments, limitations, and prognosis.")), when Dr. Tiu was the only treating source whose opinion was part of the Record.

[20] The ALJ did not discuss the weight assigned to Plaintiff's testimony; in fact, as discussed in Section III(C), *infra*, the decision does not refer specifically to Plaintiff's testimony at all.

### 2. The ALJ's Consideration of M.L.'s Functioning in the Six Relevant Domains

For each domain, the ALJ briefly reviewed some of the evidence in the Record relevant to that domain, with emphasis on Dr. Tiu's note that M.L. had been exhibiting a "better response" to her medications. Ultimately, with respect to M.L.'s functioning in each domain, the ALJ adopted the medical opinion of Dr. Berk, to whose testimony the ALJ gave the greatest weight.

### a. M.L.'s Ability To Acquire and Use Information

The ALJ determined that M.L. exhibited a "less than marked limitation" in her ability to acquire and use information. (*Id.* at 30.) This domain considers "how well children perceive, think about, remember, and use information in all settings, which include daily activities at home, at school, and in the community." (*Id.* at 29 (citing 20 C.F.R. § 416.926a(g) *and* Social Security Ruling 09-3p, 2009 WL 396025 (S.S.A. 2009).)

The ALJ referred to the following evidence in the Record, with respect to this domain:

(1) Dr. Tiu's June 18, 2010 assessment of M.L. and subsequent treatment notes, in which the doctor noted that M.L had "some learning difficulties" that limited her intellectual capacity to that of a four-year-old child, and that M.L.'s symptoms had improved in response to medication, but that M.L. still demonstrated learning difficulties and "poor concentration and learning";

(2) Dr. Hoffman's report, in which, according to the ALJ, Dr. Hoffman "included diagnoses of learning problems by history and borderline intellectual functioning, and assessments to the effect that [M.L.] would be able to perform some age-appropriate cognitive tasks and learn in accordance with cognitive functioning"; and

(3) Dr. Berk's testimony that M.L. exhibited a less than marked limitation in this domain. (*Id.* at 30.)

The ALJ then reiterated that he accorded the "highest weight" to Dr. Berk's testimony, "in recognition of Dr. Berk's thorough review of the evidence and extensive knowledge and

experience in his field," and, without further explanation, concluded that M.L.'s limitation in this domain was less than marked.  (*Id.*)

### b.   M.L.'s Ability To Attend and Complete Tasks

In the domain of "attending and completing tasks," the ALJ also found that M.L.'s impairment was "less than marked."  (*Id.* at 31.)  This domain considers how well a child is able to "focus and maintain attention," "begin, carry through and finish activities," "avoid impulsive thinking," and "prioritize competing tasks and manage her time."  (*Id.* at 30 (citing 20 C.F.R. § 416.926a(h) *and* Social Security Ruling 09-04p, 2009 WL 396033 (S.S.A. 2009).)

The ALJ referred to the following evidence in the Record, with respect to this domain:

(1)   Dr. Tiu's April 8, 2010 assessment, which included "impaired concentration" and "impulsivity" among M.L.'s symptoms;

(2)   Dr. Tiu's June 18, 2010 assessment of M.L. and subsequent treatment notes, in which she indicated that M.L. showed "decreased attention and concentration," that M.L.'s symptoms had improved in response to medication, but that M.L. still exhibited learning difficulties, distractibility, and "poor concentration";

(3)   Dr. Hoffman's report, in which, as summarized by the ALJ, M.L. had stated that watching television was her main leisure activity and that she had no "least favorite" subject in school, and in which Dr. Hoffman found M.L. "demonstrated below average attention" but borderline or average scores in other areas, and "would be unable to follow age-appropriate instructions but would be able to learn in accordance with her cognitive functioning"; and

(4)   Dr. Berk's testimony that M.L. exhibited a less than marked limitation in this domain.  (*Id.* at 31-32.)

The ALJ again reiterated that he assigned the "highest weight" to Dr. Berk's testimony, "in recognition of Dr. Berk's thorough review of the evidence and extensive knowledge and experience in his field."  (*Id.* at 32.)  Based on the weight he assigned to Dr. Berk's testimony, and without further discussion or explanation, the ALJ concluded that M.L. exhibited a less than marked limitation in the domain of attending and completing tasks.  (*Id.*)

### c. M.L.'s Ability To Interact and Relate with Others

The ALJ also concluded that M.L had a less than marked limitation in her ability to interact and relate with others.  (*Id*. at 33.)  This domain considers "how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others."  (*Id*. at 32 (citing 20 C.F.R. § 416.926a(i) *and* Social Security Ruling 09-5p, 2009 WL 396026 (S.S.A. 2009).)

The ALJ referred to the following evidence in the Record, with respect to this domain:

(1)   Dr. Tiu's April 8, 2010 assessment, which included, among M.L.'s symptoms, irritability, aggressivity, and inability to control her temper;

(2)   Dr. Tiu's June 18, 2010 assessment of M.L. and subsequent treatment notes, in which, as summarized by the ALJ, Dr. Tiu initially indicated that M.L. had a labile affect and intermittent mood swings, but that, after beginning medication, M.L. exhibited decreased aggression, decreased mood swings, intermittent irritability, and had stopped hitting Plaintiff;

(3)   Dr. Hoffman's report, in which he described M.L. as demonstrating good eye contact, as being cooperative and pleasant, and as exhibiting "adequate" adaptive functioning and socialization skills; and

(4)   Dr. Berk's testimony that M.L. exhibited a less than marked limitation in this domain.  (*Id*. at 33.)

As with the previous two domains, the ALJ again stated that he assigned the "highest weight" to Dr. Berk's testimony, "in recognition of Dr. Berk's thorough review of the evidence and extensive knowledge and experience in his field."  (*Id.*)  Without further discussion or explanation, the ALJ concluded that M.L. exhibited a less than marked limitation in the domain of interacting and relating with others.  (*Id.*)

### d. M.L.'s Ability To Move About and Manipulate Objects

The ALJ concluded that M.L. had "no limitation" in her ability to move about and manipulate objects.  (*Id*. at 34.)  This domain considers a child's "gross motor skills, fine motor

skills, or a combination of both," including limitations that "can be associated with musculoskeletal and neurological impairments, other physical impairments, medications or treatments, or mental impairments." (*Id*. (citing 20 C.F.R. § 416.926a(j) *and* Social Security Ruling 09-6p, 2009 WL 396028 (S.S.A. 2009).)

In evaluating this domain, the ALJ stated that the Record did "not indicate, or support, any limitations" on M.L.'s functioning in this domain. (*Id*.)  The ALJ then referred to Dr. Berk's testimony that M.L. exhibited no limitation in this domain, again reiterated that the ALJ assigned this testimony the highest weight, and concluded that M.L. exhibited no limitation in this domain. (*Id*. at 34-35.)

### e.       M.L's Ability to Care for Herself

The ALJ found that M.L. had "no limitation in the ability to care for herself." (*Id*. at 36.) This domain is focused on "how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways," which may include "how the child copes with stress and changes in the environment and how well the child takes care of her own health, possessions, and living area." (*Id*. at 35 (citing 20 C.F.R. § 416.926a(k) *and* Social Security Ruling 09-7p, 2009 WL 396029 (S.S.A. 2009).)

As with the domain of moving about and manipulating objects, the ALJ stated that the Record did "not indicate, or support, any limitations on the claimant's ability to care for herself." (*Id*. at 36.)  The ALJ again referred to Dr. Berk's testimony that M.L. exhibited no limitation in this domain, stated that he accorded this testimony the highest weight, and concluded that M.L. exhibited no limitation in this domain. (*Id*.)

### f.       M.L.'s Health and Physical Well-Being

Finally, the ALJ found that M.L. had a less than marked limitation in her overall health and physical well-being. (*Id*.)  In evaluating a child's functioning in this domain, an ALJ

considers "the cumulative physical effects of physical and mental impairments and any

associated treatments or therapies on a child's health and functioning that were not considered in

the evaluation of the child's ability to move about and manipulate objects," including "how

recurrent illness, the side effects of medication, and the need for ongoing treatment affect the

child's health and sense of physical well-being."  (*Id.* (citing 20 C.F.R. § 416.926a(l) *and* Social

Security Ruling 09-8p, 2009 WL 396030 (S.S.A. 2009).)

   Without reference to specific evidence, the ALJ noted that, "as discussed above, [M.L.

had] begun to show improvement, with proper medication management and adjustment,"

although her symptoms "[had] not completely abated" and Dr. Hoffman had recommended

continuation of mental health care.  (*Id.*)  The ALJ then noted that Dr. Berk had testified that

M.L.'s limitation in this domain was less than marked, stated that this testimony was "supported

by the evidence of record," and reiterated that he accorded this testimony the highest weight.

(*Id.*)  Again, without further explanation or discussion, the ALJ then concluded that M.L.'s

limitation in this domain was less than marked.  (*Id.*)

### 3.      The ALJ's Conclusion Regarding Functional Equivalence

   After his review of the evidence in each domain, as summarized above, the ALJ ruled

that M.L. "d[id] not have an impairment or combination of impairments that result[ed] in either

'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of

functioning."  (*Id.*)   The ALJ therefore concluded that M.L. had not been disabled, as defined in

the Act, since the date the application was filed.  (*Id.*)

## III.    REVIEW OF THE ALJ'S DECISION

### A.      The ALJ's Application of the Treating Physician Rule

   Plaintiff argues that the ALJ failed to apply the treating physician rule, resulting in an

erroneous finding that M.L. did not have an impairment that medically equaled the Listing for

Mood Disorder.  (Pl. Mem., at 13-18.)  Specifically, Plaintiff argues that Dr. Tiu's assessment in

the Questionnaire that M.L. exhibited all of the symptoms and impairments required to meet the

listing for Mood Disorder is "uncontradicted by any examining source," and that Dr. Tiu's

assessment should therefore have been accorded controlling weight or, in the alternative, should

have been given greater weight than opinions of non-treating physicians, under the treating

physician rule.[21]  (Id. at 13-15.)  Plaintiff also argues that, in considering functional equivalence,

the ALJ erred by giving higher weight to Dr. Berk's opinion that M.L.'s limitations were not

marked, than to the portions of Dr. Tiu's notes that suggest that M.L. suffered from greater

limitations.  (Id. at 21-23.)  Defendant does not directly address these arguments, although she

contends that Dr. Tiu's findings, at least insofar as reflected in the Questionnaire, were

"conclusory" and were not supported by the Record.  (Def. Mem., at 13-17.)

### 1.    The ALJ's Application of the Treating
### Physician Rule in Considering Medical Equivalence

In addressing whether M.L.'s impairments met or medically equaled the Listings, the

ALJ did not specifically discuss the weight he accorded to Dr. Tiu's medical opinion, including

the opinions expressed in the Questionnaire.  (See R. at 26-27.)  It is clear, however, that the ALJ

did not assign "controlling weight" to Dr. Tiu's findings, particularly those included in the

Questionnaire, given that, as discussed above, the Questionnaire indicated that M.L.'s

impairments were medically equivalent to the Listing for Mood Disorder, and the ALJ found that

they were not.  In discussing the Questionnaire, the ALJ noted Dr. Berk's testimony that it was

"difficult for [Dr. Berk] to accept" Dr. Tiu's findings in the Questionnaire, and that they were not

---

[21] Although Plaintiff cites, in support of this argument, to 20 C.F.R. § 404.1527, which
applies to Social Security Disability Insurance benefits under the Act, this Court construes this
argument to be made under 20 C.F.R. § 416.927, the identically-worded provision applicable to
SSI benefits.

supported by the other medical evidence.  (*Id.* at 26.)  The ALJ then went on to "accept" and "give the greatest weight" to Dr. Berk's testimony, and found that M.L.'s impairments did not meet or medically equal the Listings.

As to this aspect of his decision, the ALJ erred by neglecting to apply the treating physician rule.  Although the treating physician rule would have allowed the ALJ to give less than controlling weight to Dr. Tiu's medical opinion based on a finding that it was inconsistent with other substantial evidence in the Record, the ALJ did not make such a finding here.  Instead, the ALJ appears to have simply adopted *Dr. Berk's opinion* that there was "no support anywhere in the medical evidence" for Dr. Tiu's findings in the Questionnaire, rather than making his own assessment.  Dr. Berk, however, testified without having had the opportunity to review significant evidence in the Record, including the portions of Dr. Tiu's treatment notes that were not obtained until after the hearing, all of the records of treatment and evaluation that took place after the hearing, and Plaintiff's testimony as to M.L.'s functioning.[22]  The ALJ's full reliance on Dr. Berk's testimony, without acknowledging or attempting to reconcile the fact that his testimony was limited in this regard, was in error.  In addition, even if the ALJ had indeed found that Dr. Tiu's opinion was inconsistent with substantial evidence in the Record, the ALJ was still required, as discussed in the following section, to assign a particular weight to Dr. Tiu's opinion, based on his evaluation of the factors listed in 20 C.F.R. § 416.927(c).

Because the ALJ's failed to apply the treating physician rule with respect to Dr. Tiu's opinions in considering medical equivalence, remand is appropriate to give the Commissioner the opportunity to assess the evidence, applying the correct legal standard.  *See, e.g.*, *Rugless v.*

---

[22] Dr. Berk testified at the outset of the hearing, before Plaintiff had testified, and was dismissed from the hearing by the ALJ before Plaintiff had completed her testimony.

*Comm'r of Soc. Servs.*, 548 F. App'x 698, 700 (2d. Cir. 2013) (summary order) (remanding

where the ALJ "gave only a conclusory explanation of why [the treating physician's] opinion

regarding [the claimant's] ability to lift 10 lbs. [was] inconsistent with the record."); *Sanders v.*

*Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (summary order) ("[The Second Circuit] has

consistently held that the failure to provide good reasons for not crediting the opinion of a

claimant's treating physician is a ground for remand." (citations omitted)).   Accordingly, this

Court recommends that the case be remanded with specific instructions that, upon remand, the

ALJ apply the treating physician rule, 20 C.F.R. § 416.927(c), in considering medical

equivalence.   If the ALJ chooses not to accord controlling weight to Dr. Tiu's opinion, the ALJ

should give "good reasons" for this decision, and should discuss the weight assigned to Dr. Tiu's

opinion, in accordance with this regulation.

### 2.   The ALJ's Application of the Treating Physician Rule in Considering Functional Equivalence

In addressing whether M.L.'s impairments were functionally equivalent to an impairment

in the Listings, the ALJ stated that he accorded "less than significant weight" to the treating

source opinions that were not consistent with the substantial evidence, but "highly significant

weight" to the treating source opinions that were consistent with the substantial evidence.

(R. at 28.)   As noted above, however, the only treating source opinions in the Record of this case

were those of Dr. Tiu, and it thus appears that the ALJ accorded differing weights to different

portions of Dr. Tiu's notes and findings.   In discussing the weight he gave to treating source

opinions, the only specific evidence referenced by the ALJ, to which he explicitly gave "less

than significant weight," was the Questionnaire.   (*Id.*)   While he did not state as much, the ALJ

appears to have accorded greater weight to Dr. Tiu's treatment notes, where they indicated that

M.L had responded well to medication; in fact, the ALJ referred to one of those notes as a basis

for his finding that the Questionnaire was inconsistent with substantial evidence in the Record. (*Id.*)  To the extent Dr. Tiu's treatment notes were *consistent* with the Questionnaire, though, it appears that the ALJ discounted them, although, again, he did not explain this.

Overall, while the ALJ cited a permissible reason for choosing not to accord controlling weight to portions of Dr. Tiu's findings (*i.e.*, that they were not consistent with other substantial evidence in the Record), the ALJ's conclusory and boilerplate assertion that some of Dr. Tiu's findings were inconsistent with substantial evidence in the Record is insufficient to enable the Court to conclude that the treating physician rule was applied properly in this instance.

First (with the exception of the Questionnaire), the ALJ did not specify the portions of Dr. Tiu's findings to which he accorded "highly significant weight" and "less than significant weight," nor did he provide any reasoning supporting his finding of inconsistency.  Accordingly, this Court cannot determine whether the ALJ applied the factors listed in 20 C.F.R. § 416.927(c) at all, much less review the adequacy of the ALJ's application of the law.  It appears highly unlikely, however, that careful consideration of the factors listed in 20 C.F.R. § 416.927(c) – including the length, nature, and extent of the relationship between the physician and the claimant; the supportability of the opinion; the consistency of the opinion with the record as a whole; and the specialization of the physician providing the opinion – would support a finding that Dr. Berk's opinion, formed solely on the basis of a review of incomplete medical records, should be accorded higher weight than the opinions of Dr. Tiu, M.L.'s treating physician.

Second, with respect to the Questionnaire, the ALJ's conclusory assertion that the findings contained therein were inconsistent with substantial evidence in the Record, specifically a note by Dr. Tiu indicating that M.L. was exhibiting a "better response" to medication, is also insufficient to demonstrate proper application of the treating physician rule.  As with the rest of

31

Dr. Tiu's findings and opinions, the ALJ has not addressed, as required, the factors in 20 C.F.R.

§ 416.927(c) with respect to the opinions contained in the Questionnaire.

Third, the ALJ has not specified the ways in which he found the Questionnaire to be inconsistent with substantial evidence in the Record, and the purported inconsistency is not readily apparent.  On the contrary, Dr. Tiu's notes from M.L.'s later visits, occurring after submission of the Questionnaire, clearly indicate that, even with medication, M.L. continued to experience symptoms including, *inter alia*, aggression, dysphoria, irritable mood, and poor concentration.  (*See* R. at 322-24.)  To the extent that the ALJ's finding of inconsistency was based on his own opinion that M.L. could not have both responded well to medication *and* have continued to exhibit several symptoms and marked impairments, the ALJ improperly substituted his own judgment for medical opinion.  *See, e.g.*, *Lopez-Delgado v. Comm'r of Soc. Sec.*, No. 13cv5727 (JCF), 2014 WL 3687276, at *8 (S.D.N.Y. July 23, 2014) (finding ALJ committed error by "substitut[ing] his own judgment for competent medical opinion" where the ALJ found that the treating physician's psychiatric assessment report diagnosing claimant with "major depressive disorder recurrent" was inconsistent with the treating physician's notes indicating that some symptoms had abated).  In addition, to the extent that the ALJ simply relied on Dr. Berk's medical opinion in making this finding, this reliance was inappropriate, given that Dr. Berk did not have the opportunity to review all of Dr. Tiu's treatment notes, particularly the notes postdating the hearing itself, which addressed, more specifically, M.L.'s limitations even while taking medication.  In any event, the ALJ has not set forth the basis for his finding of inconsistency, and this Court is, therefore, unable to review this finding.

Furthermore, although Dr. Tiu's notes indicate that medication helped to stabilize M.L.'s mood and to decrease her irritability and aggression (*see id.* at 256, 324), Dr. Tiu's findings in

the Questionnaire are not limited to these symptoms (*see, e.g.*, *id.* at 248 (indicating M.L.

demonstrated marked impairments in cognitive/communicative function, social functioning,

personal functioning, and in maintaining concentration, persistence, or pace)), and the ALJ

provided no explanation as to why he accorded "less than significant weight" to all of the

findings included in the Questionnaire.  Although it may be appropriate for an ALJ to set aside a

form competed by a physician based on "circumstances . . . suggest[ing] that [it] was hastily

completed and did not necessarily reflect the whole course of [the claimant's] treatment,"

*Marquez v. Colvin*, No. 12cv6819 (PKC), 2013 WL 5568718 at *12 (S.D.N.Y. Oct. 9, 2013), the

ALJ made no such finding here, and no such circumstances are apparent.

　　　Accordingly, this Court further recommends that, upon remand, the ALJ be directed to

apply the treating physician rule with respect to his assessment of whether M.L.'s impairments

were functionally equivalent to an impairment in the Listings.  In making this assessment, the

ALJ should, again, specifically discuss the factors listed in 20 C.F.R. § 416.927(c) with respect

to Dr. Tiu's specific findings and opinions.  This Court recommends that the ALJ be further

directed to take care not to substitute his judgment for medical opinion, and be reminded of his

duty to develop the Record, should he, upon careful consideration of the Record, find

inconsistency within Dr. Tiu's medical opinions.  *See, e.g.*, *Yu v. Astrue*, 963 F. Supp. 2d 201,

215 (E.D.N.Y. 2013) ("[T]he ALJ had a duty to develop the record to resolve any conflict in the

respective opinions from [the treating physician]." (citing *Rosa v. Callahan*, 168 F.3d 72, 76,

79-80 (2d. Cir. 1999) (Sotomayor, J.) (additional citations omitted))); *Ocasio v. Barnhart*,

No. 00cv6277 (SJ), 2002 WL 485691, at *8 (E.D.N.Y. Mar. 28, 2002) ("If the reports of treating

physicians are insufficient or inconsistent, the ALJ may not simply dismiss them.  Rather, he has

an affirmative duty to develop the administrative record, including seeking additional

information from the treating physicians." (citations omitted)).

**B.      The Weight the ALJ Accorded to Dr. Berk's**
**Opinion with Respect to the Six Domains of Functioning**

Plaintiff argues that the ALJ relied fully on Dr. Berk's testimony with respect to M.L.'s

functioning in the six domains relevant to functional equivalence, and that this reliance was

improper because (1) Dr. Berk's testimony did not take into account all of Dr. Tiu's treatment

notes, many of which, as noted above, were submitted after the hearing, and (2) the ALJ stated

that he was according Dr. Berk's opinion significant weight due, in part, to Dr. Berk's purported

opportunity to observe M.L. at the hearing, but that, according to Plaintiff, "observation of a six

year old at a hearing lasting less than one hour, during which the child answered two or three

questions directly, is patently insufficient to form opinions in the various domains."  (Pl. Mem.,

at 18-19).  Defendant does not address these arguments in her brief although, in arguing that the

ALJ's decision was supported by substantial evidence, she appears to contend that the ALJ's

reliance on Dr. Berk's opinion was appropriate.  (*See* Def. Mem., at 18-23.)

As with Dr. Tiu's medical opinion, discussed above, the ALJ also failed to apply the

correct legal standards in assessing the weight to be accorded to Dr. Berk's medical opinion.  In

determining the weight to be given to this opinion, the ALJ was required to consider the factors

listed in 20 C.F.R. § 416.927(c), including whether there existed either any examining or

treatment relationship, the supportability and consistency of Dr. Berk's medical opinion, and

Dr. Berk's specialization.  20 C.F.R. § 416.927(e)(2)(ii)-(iii).  In his decision, rather than

discussing the factors identified in the regulations, the ALJ stated that he gave the greatest

weight to Dr. Berk's testimony because of Dr. Berk's supposed "opportunity to observe the

claimant at the hearing," his "extensive experience and familiarity in the field of Child

Psychiatry," and the consistency of Dr. Berk's testimony with substantial evidence in the Record.

(R. at 28.)  Not only do these criteria not match the factors set out in the applicable regulation, but the Record does not particularly support the conclusion that the factors the ALJ did consider justified his according Dr. Berk's opinion greater weight than the opinions of any other medical sources.

As to the first of the ALJ's stated reasons for relying on Dr. Berk's opinion (Dr. Berk's opportunity to observe M.L. at the hearing), Dr. Berk actually testified that his opinion was based on his "examination of the record" (*id.* at 51) – *not* on any observation of M.L. – and he testified as to his medical opinion at the *outset* of the hearing, presumably before having been afforded even the limited opportunity to "observe" M.L. that her presence at the hearing might have provided.  (*See id.* at 48-51.)  Furthermore, although, at Dr. Berk's request – which Dr. Berk made only after having already offered his medical opinion as to M.L.'s functional limitations – the ALJ briefly questioned M.L., the ALJ stated that he "doubt[ed] [they were] getting any good response" from M.L., and that they were "probably going to have to take some testimony from [Plaintiff]."  (*Id.* at 61-62.)  While Plaintiff was testifying, however, the ALJ excused Dr. Berk from the hearing.  (*Id.* at 71.)  In any event, both Dr. Tiu, as M.L.'s treater, and Dr. Hoffman, as an examining consultant, certainly both had a better opportunity to observe M.L. than Dr. Berk.[23]

---

[23] In this regard, the Court notes that the ALJ essentially appears to have disregarded the requirement that he consider, in determining the weight to be given to a medical opinion, whether an examining or treating relationship existed between the physician and the claimant. Although an ALJ is generally required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [him or her]," 20 C.F.R. § 416.927(c)(1), the ALJ, without explanation, gave greater weight to the opinion of Dr. Berk, a non-examining physician, than to the opinion of Dr. Hoffman, who examined M.L., despite finding that both opinions were consistent with the substantial evidence (R. at 28).

As to the ALJ's second stated reason for relying so heavily on the opinion of Dr. Berk (his experience in, and familiarity with, the relevant medical field), the ALJ, in his decision, at first – erroneously – identified Dr. Berk as "Board-certified in the applicable field of Child Psychiatry." (R. at 26.) In fact, Dr. Berk's *curriculum vitae,* which was made part of the Record, identifies him as Board certified only in Pediatrics, although, at Mount Sinai Hospital, he has apparently served as a "Pediatric Liaison" for the hospital's Inpatient Child Psychiatry Service. (*See id.* at 148.) While Plaintiff, through counsel, did not object to Dr. Berk's testifying as an "expert" at the administrative hearing (*see id.* at 48), the extent of his expertise was never clarified. Rather, the Record is silent as to the nature, if any, of Dr. Berk's formal training in pediatric psychiatry, or in psychiatry at all. In contrast, the Court notes that M.L.'s treating physician was identified in the Record as a child psychiatrist (*see, e.g.*, *id.* at 253), and Dr. Hoffman, who, as noted above, at least had the opportunity to examine M.L., was identified as a consulting psychologist (*see id.* at 345).

As to the third factor cited by the ALJ for weighing Dr. Berk's opinion so heavily (the consistency of Dr. Berk's testimony with the evidence in the Record), the ALJ has not supported this assertion by pointing to *any* specific evidence in the Record, much less substantial evidence, and this purported consistency is not readily apparent. Indeed, the Record contains significant evidence supporting a conclusion that M.L. had more substantial limitations (even while on medication) than those described by Dr. Berk. For example, as discussed in the following section, Plaintiff testified as to the apparently-significant limitations M.L. demonstrated even while taking medication, but the ALJ neglected to discuss Plaintiff's testimony at all, much less weight it against Dr. Berk's. In addition, many of Dr. Tiu's treatment notes indicate that, even while M.L. was taking medication, she continued to experience many of the symptoms Dr. Tiu

initially recorded, which would support a finding of more substantial limitations.  (*See, e.g.*, *id.* at

325 (indicating that, while taking medication, M.L. was experiencing hypervigilance,

nightmares, and mood swings, and exhibited poor social, learning, and communication skills); *id.*

at 323 (indicating that, while taking medication, M.L. experienced distractibility, impulsivity,

dysphoric mood, inattention, poor concentration, intermittent aggression, and sleep

disturbances).)  In his decision, however, the ALJ, did not lay Dr. Berk's opinion side-by-side

with any of the evidence in the Record, but instead stated, without explanation, that Dr. Berk's

opinion was consistent with substantial evidence therein.  This Court, therefore, cannot

determine whether the ALJ in fact made a meaningful assessment of the consistency of

Dr. Berk's testimony.

Although an ALJ may consider factors other than those specifically identified in the

regulation in weighing medical opinions, *see* 20 C.F.R. § 416.927(c)(6), here, as shown above,

the ALJ not only neglected to discuss the factors specifically listed in the regulations, but also

relied on factors that could not have supported his decision to weigh Dr. Berk's opinion more

heavily than the opinions of both M.L.'s treating physician and the examining consultant.  Thus,

this Court cannot conclude that the ALJ applied the correct legal standard in determining the

weight to be accorded to Dr. Berk's testimony.

Finally, this Court is persuaded that the ALJ's adoption of Dr. Berk's opinions with

respect to each of the six domains of functioning was error because, despite mentioning some of

the evidence in the Record relevant to each of those domains, the ALJ made no effort to interpret

the evidence himself; instead, the ALJ adopted Dr. Berk's opinion with respect to each domain

based, in part, on Dr. Berk's supposed "thorough review of the evidence."  (*See* R. at 30, 32, 33,

34, 36 (ALJ reiterating, as to each domain, that Dr. Berk had reviewed "the entire evidence of

record").)  As it is indisputable that Dr. Berk had *not* reviewed significant evidence in the Record at the time he provided his opinion – including portions of Dr. Tiu's notes, Dr. Hoffman's assessment, and Plaintiff's testimony – the ALJ's full reliance on Dr. Berk's testimony, without acknowledging or attempting to reconcile the limited scope of Dr. Berk's review of the evidence, was misplaced.

For these reasons, this Court concludes that the ALJ did not apply the proper legal standard in determining the weight to be accorded to Dr. Berk's medical opinion with respect to the six domains of functioning, and relied unduly on Dr. Berk's opinion in this regard. Accordingly, this Court recommends that, upon remand, the ALJ be directed to consider the weight to be given to Dr. Berk's opinion, in accordance with 20 C.F.R. § 416.927(c), and to address the factors enumerated therein in his decision.  In addition, as it appears that the ALJ disregarded these factors with respect to Dr. Hoffman's opinion, as well (*see* n.23, *supra*), the ALJ should also be directed to apply and discuss these factors with respect to Dr. Hoffman's findings.

**C.**   **The ALJ's Consideration of Plaintiff's Testimony**
**with Respect to the Six Domains of Functioning**

Plaintiff also contends that, in tandem with relying too heavily on Dr. Berk's testimony, the ALJ improperly ignored evidence that would support a finding of disability, particularly Plaintiff's testimony regarding M.L.'s impairments.[24]  (Pl. Mem., at 18-21.)  Defendant, once again, does not address this argument, but instead merely argues that the ALJ's decision was supported by substantial evidence in the Record.  (Def. Mem., at 18-25.)

---

[24] Plaintiff also contends that the ALJ ignored portions of Dr. Tiu's notes and Dr. Hoffman's findings that would have supported a finding of disability.  As discussed in Sections III(A)-(B), *supra*, this Court recommends that the ALJ be directed to consider the these physicians' findings in accordance with 20 C.F.R. § 416.927(c).

Although an ALJ need not "have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), "[i]t is grounds for remand for the ALJ to ignore parts of the Record that are probative to the claimant's disability claim," *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) (citations omitted).  Furthermore, an ALJ is required to consider statements from parents in evaluating the "intensity and persistence" of a child's symptoms, and in determining the extent to which the child's symptoms limit his or her functioning.  20 C.F.R. §§ 416.928(a), 416.929(c).

In this case, the ALJ's decision was based primarily on his finding that, with the benefit of medication, M.L.'s impairments were not marked.  The ALJ's decision, however, did not make a single reference to Plaintiff's testimony,[25] which was focused on describing M.L.'s impairments, even while M.L. was taking the medication prescribed by Dr. Tiu.  Plaintiff testified, for example, that, even while on medication, M.L. frequently became "really frustrated" with other children and then "beat on them" (R. at 78), would put toy knives to her throat (*id.* at 77), and experienced visual hallucinations of M.L.'s deceased great grandmother (*id.* at 76).  This testimony was consistent with Dr. Tiu's treatment notes and with the Questionnaire, which indicated that, around the time of the hearing, M.L. continued to act aggressively and to exhibit

---

[25] In his decision, the ALJ stated that he considered "all the relevant evidence" with respect to M.L.'s impairments, "including statements from the claimant's parent(s) or other caregivers."  (R. at 27.)  He also stated that the allegations made by Plaintiff "in applying" for benefits, "concerning the intensity persistence, and limiting effects" of M.L.'s symptoms, "[were] not credible to the extent they [were] inconsistent" with the ALJ's ultimate findings.  (*Id.* at 27-28.)  To the extent that these statements encompass Plaintiff's testimony at the hearing, these boilerplate and conclusory recitations are insufficient to demonstrate that the ALJ considered Plaintiff's testimony in accordance with the regulations discussed in this section.

self-destructive behavior, and that she experienced visual hallucinations.  (*See, e.g.*, *id.* at 246, 322.)

While, as the factfinder, the ALJ was "free to accept or reject" Plaintiff's testimony, reasons for the rejection "must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988).  The ALJ was required to consider, for example, "whether there [were] any inconsistencies in the evidence and the extent to which there [were] any conflicts between [Plaintiff's] statements and the rest of the evidence, including [M.L.'s] history, the signs and laboratory findings, and statements by [M.L.'s] treating or nontreating sources . . . about how [M.L.'s] symptoms affect[ed] [M.L.]"  20 C.F.R. §§ 416.928(a), 416.929(c)(4).  Given that the ALJ did not discuss Plaintiff's testimony, which was highly relevant to the ALJ's ultimate conclusion that, because of medication, M.L.'s impairments were not marked, it appears that the ALJ did not consider Plaintiff's testimony as required by the regulations.

Accordingly, this Court recommends that, upon remand, the ALJ be directed to address specifically Plaintiff's testimony regarding M.L.'s functioning in each of the six domains, and to assess that testimony in accordance with 20 C.F.R. §§ 416.928(a) and 416.929(c).

## D.    **Substantial Evidence Review**

Throughout her brief, Defendant argues that the ALJ's decision should be upheld because it is supported by substantial evidence.  (*See* Def. Mem., at 13-24.)  Where remand is appropriate because an ALJ did not apply the law properly in assessing the evidence or did not consider certain evidence, however, a court should not, prior to remand, attempt to assess whether substantial evidence in the Record supports the ALJ's ultimate disability determination.  *See, e.g.*, *Silberman v. Astrue*, No. 08cv03398 (RMB) (THK), 2009 WL 2902576, at *11, 14

(S.D.N.Y Aug. 14, 2009), *report and recommendation adopted by* 2009 WL 2778245 (Sept. 1, 2009).  Accordingly, at this juncture, the Court should not attempt to make this assessment here.

## IV.   NATURE OF THE RECOMMENDED REMAND

### A.   Remand for Further Proceedings

A district court may affirm, modify, or reverse the decision of the Commissioner, "with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (sentence four).  Plaintiff argues that, here, there is no need for agency reconsideration; rather, according to Plaintiff, the decision of the ALJ should simply be reversed and the case remanded only for the calculation of benefits.  (Pl. Mem., at 18, 23-24.)  Where a court finds that the ALJ has applied an improper legal standard, however, the court "generally remands the matter to the Commissioner for further consideration."  *Acevedo v. Astrue*, No. 11cv8853 (JMF) (JLC), 2012 WL 4377323, at *9 (S.D.N.Y. Sept. 4, 2012), *report and recommendation adopted* by 2012 WL 4376296 (Sept. 24, 2012).  In addition, this is not a case in which the Record clearly demonstrates that M.L. is disabled, as there is evidence in the Record that could support a denial of benefits – including the medical opinion of Dr. Hoffman, the medical opinion of Dr. Berk, and portions of Dr. Tiu's treatment notes – further suggesting that a remand for further consideration would be appropriate. *See e.g.*, *Silberman*, 2009 WL 2902576 at *15.   Accordingly, I recommend that the case be remanded for further consideration, rather than for the calculation of benefits.

### B.   Remand to a Different ALJ

Plaintiff also argues that, in the event of remand, the case should be assigned to a different ALJ, based on bias purportedly displayed by the ALJ in favor of Dr. Berk at the hearing and in the ALJ's decision.  (Pl. Mem., at 21-23.)  Specifically, Plaintiff argues that the ALJ displayed bias by "interrupting plaintiff's counsel, and precluding effective cross-examination

[of Dr. Berk]," and by relying too heavily on Dr. Berk's medical opinion. (*Id.*) Defendant addresses this argument, albeit briefly, by contending that the ALJ did not interrupt Plaintiff's counsel at the hearing because of bias, but rather for the purpose of directing counsel to "ask questions that were likely to elicit facts or opinions from Dr. Berk, as opposed to merely asking [Dr. Berk] to confirm that a document says what it plainly says or mak[e] [an] argument." (Def. Mem., at 25.) In addition, in arguing that the ALJ's decision was supported by substantial evidence, Defendant appears to argue that the ALJ's reliance on Dr. Berk's testimony was appropriate. (*See id.*, at 13-24.) Although it is difficult to conclude that the ALJ acted with actual bias in denying M.L.'s benefits claim, this Court nevertheless agrees with Plaintiff that the ALJ's conduct was sufficiently troubling to justify a direction that, on remand, this case be considered by a different ALJ.

It is clear that an ALJ "shall not conduct a hearing if he or she is prejudiced or partial with respect to any party." 20 C.F.R. § 416.1440. Although the decision to remand a case to a new ALJ is one typically accepted to be within the Commissioner's discretion, a "federal judge may issue [an order directing that a different ALJ be assigned] when the ALJ's conduct gives rise to serious concerns about the fundamental fairness of the disability review process." *Rodriguez v. Astrue*, No. 11cv7720 (CM) (MHD), 2012 WL 4477244, at *33 (S.D.N.Y. Sept. 28, 2012) (citations omitted); *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (reviewing cases in which district and circuit courts directed remand to a different ALJ). Legal error alone is insufficient to support a finding of bias. *See, e.g.*, *Avila v. Astrue*, 933 F. Supp. 2d 640, 655 (S.D.N.Y. 2013). Where, however, there is a clear indication that the ALJ will not apply the appropriate legal standard on remand¸ it may be appropriate to direct that the case be reassigned on remand. *Sutherland*, 322 F. Supp. 2d at 292. Sufficiently serious concerns

regarding the fairness of the review process may also exist where, in the original hearing, the ALJ exhibited inappropriate hostility toward a party, or, due to apparent hostility toward a party, refused to consider portions of the testimony or evidence favorable to that party, or refused to weigh or consider evidence with impartiality.  *Id.*

In this case, it is not the fact that the ALJ interrupted Plaintiff's counsel during her attempted cross-examination of Dr. Berk, or the fact that the ALJ relied so heavily on Dr. Berk's opinion, but rather the combination of the two that gives rise to concern.  The transcript of the hearing reveals that the ALJ did not merely interrupt particular questions that counsel posed to Dr. Berk, but rather blocked virtually *any* effort by counsel to explore the bases of Dr. Berk's opinion or to challenge his assumptions.  (*See* R. at 51-66 (ALJ cutting off nearly every cross-examination question posed to Dr. Berk by Plaintiff's counsel).)  Regardless of whether the ALJ's conduct in this regard was the result of "prejudice[] or partial[ity]," 20 C.F.R. § 416.1440, it did appear to manifest unwarranted hostility.  Then, having thwarted counsel's attempt to highlight any flaws in Dr. Berk's analysis, the ALJ went on to misapply governing legal standards by weighing Dr. Berk's opinion more heavily than the opinion of M.L.'s treating psychiatrist, without regard to relevant factors.  Certainly, if the ALJ had been inclined to adopt Dr. Berk's views in their entirety – even though Dr. Berk had not had the opportunity to review M.L.'s entire treatment record, or even to examine her personally – the ALJ should not have done so without at least affording Plaintiff's counsel a reasonable opportunity to demonstrate, through cross-examination, why those views were not entitled to blanket adoption.

The ALJ's legal errors, as described above, taken together with his conduct of the underlying hearing, resulted in his inadequate consideration, to Plaintiff's detriment, of the evidence of M.L.'s claimed disability.  Moreover, the ALJ's willingness to assign seemingly

inappropriate weight to Dr. Berk's opinion after effectively undermining his cross-examination does raise a serious question as to whether, on remand, M.L.'s benefits claim would receive fair consideration if placed before the same ALJ.  Under the particular circumstances presented here, it is this Court's view that remand to a different ALJ would be warranted.  *Cf. Ocasio v. Astrue*, No. 08cv2016 (JCF), 2009 WL 2905448, at *6 (S.D.N.Y. Sept. 4, 2009) (remanding to a different ALJ where, although the ALJ "may not have displayed outright hostility toward [the plaintiff], he certainly demonstrated a lack of sensitivity to her impairments, [by doing] little more than gloss[ing] over seemingly serious symptoms").

Accordingly, this Court recommends that, upon remand, the case be assigned to a different ALJ.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that:

(1)     Plaintiff's motion for judgment on the pleadings (Dkt. 11) be granted, but that, rather than reversal, the case be remanded, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings before a different ALJ to determine whether M.L.'s impairments meet, medically equal, or functionally equal an impairment in the Listings, and

(2)     Defendant's cross-motion for judgment on the pleadings (Dkt. 13) be denied.

I further recommend that, in assessing whether M.L.'s impairments meet or equal the Listings, the ALJ assigned upon remand be directed (a) to apply, and to discuss in his or her decision, the factors set out in 20 C.F.R § 416.927(c) with respect to the weight assigned to the medical opinions of Drs. Tiu, Hoffman, and Berk, and (b) to consider, and to discuss in his or her decision, Plaintiff's testimony with respect to M.L.'s symptoms and impairments, in accordance with 20 C.F.R. § 416.929.

44

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley, III, United States Courthouse, 500 Pearl Street, Room 1920, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007. Any requests for an extension of time for filing objections should be directed to Judge Pauley. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        December 22, 2014

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. William H. Pauley, III, U.S.D.J.

All counsel (via ECF)

45